## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

JILLIAN ADE,

        Plaintiff,

        v.

CONKLIN CARS SALINA, LLC,

        Defendant.

Case No. 5:17-CV-04117-HLT

## MEMORANDUM AND ORDER

Plaintiff Jillian Ade has sued her former employer, Defendant Conklin Cars Salina, LLC, for wrongful termination under Title VII and retaliatory discharge under Kansas law. Ade contends her termination violated Title VII because a male co-worker received more favorable treatment. She alleges her termination was retaliatory and unlawful under Kansas law because it came after she had raised concerns about how other employees were being paid.

Conklin Cars moves for summary judgment on all claims. Doc. 37. For the reasons stated below, the Court grants summary judgment to Conklin Cars on Ade's Title VII claim because Ade has not demonstrated a genuine issue of material fact that the stated reasons for her termination were pretext. The Court further grants summary judgment to Conklin Cars on Ade's state law retaliatory-discharge claim because she has not alleged sufficient facts to establish she was fired for exercising her rights under the Kansas Wage Payment Act or for whistleblowing.

## I.     BACKGROUND

Conklin Cars is an automotive dealership with locations in Salina and Hutchinson. Doc. 38 at 6. Ade began working for Conklin Cars selling used cars at the Salina location in 2005. *Id.* at 7; Doc. 41 at 8. Her supervisor in Salina was Javier Lopez, the Used Truck Manager. Doc. 41 at 8. In 2010, Ade left the Salina location to take a position in Hutchinson as the Honda Sales Manager,

a position she held until December 2016, when she resigned because of the long commute. Doc. 38 at 7; Doc. 41 at 8. After she resigned, Ade contacted Lopez to ask about openings at the Salina location, which was closer to her home. Doc. 38 at 8-9.

Around that time, the Used Cars Sales Manager position opened in Salina, and Ade asked to be considered for it. Doc. 38 at 9. She contacted the Salina General Manager, Gerard Smith, and also discussed it with Lopez, who recommended Ade for the job. *Id.* Smith hired Ade for the Used Car Sales Manager position because "she'd done a good job previously so I thought she could do a really good job." *Id.* Ade started her new position at the Salina branch in December 2016. Doc. 41 at 8.[1]

### A.    Ade's Second Tenure in Salina

Although Ade's second tenure at the Salina branch lasted only a few months before she was fired, she was involved in several incidents. The first involved Ade getting angry at an employee who failed to satisfactorily wash a car before bringing it to the lot. Doc. 38. at 9. Ade complained to the employee's supervisor and demanded the employee be fired. *Id.* at 10. When the supervisor refused, Ade threatened to fire the employee herself even though she did not have authority over that particular worker. *Id.* Another incident involved Ade stating that the finance department was "too slow," "old," and "slow as fuck." *Id.* Yet another time, a sales representative confronted Ade and accused her of playing favorites. *Id.* Ade explained her actions but also said that she could do "whatever the fuck" she wanted to do and called the sales representative a "cry baby." *Id*; Doc. 41 at 4.

---

[1]    Ade's statement of additional facts says that she started in December 2017. But this appears to be a typo given that her termination occurred in June 2017. The deposition testimony cited in support reflects that Ade went back to the Salina location on December 29, 2016. Doc. 41-1 at 10 (deposition page 37, line 10).

Other employees at Conklin Cars occasionally cursed at work. Doc. 38 at 10; Doc. 41 at 9; Doc. 46 at 18. Ade testified that Lopez cursed at coworkers, but she could only recall one specific occasion. Doc. 41 at 9; Doc. 41-1 at 34-35 (deposition pages 99-100). But Ade cursed more than most, to the extent it was sometimes an issue. Doc. 38 at 10; Doc. 41 at 4; Doc. 46 at 8.[2] On at least three occasions in the approximately six months that Ade was back working at the Salina location, Smith had to speak to her about her use of bad language. *Id.* at 10; Doc. 41 at 4. And towards the end of her time at the Hutchinson location, Ade conducted a sales meeting during which she used profanity. Doc. 38 at 7-8. After that meeting, an anonymous complaint was made to the Hutchinson general manager, Myron Sasse. *Id.* at 8. Sasse met with Ade and verbally reprimanded her about her use of bad language at work. *Id.* Around that same time, Ade received an anonymous note from an employee describing the ways in which she was a bad manager, including using bad language and playing favorites. *Id.*

**B.    Ade's Termination**

Ade's second tenure in Salina culminated in an email exchange with Smith while Smith was on vacation. Ade's email to Smith, sent in June 2017, read:

> There is no reason the contest payouts should [be] taken out of the salesperson guarantee. If it's a bonus it's a bonus. They should be paid the 1500 plus the bonus they won. You do this to get them excited to sell and then turn around and not pay. That is just wrong.
>
> I think the contest work for creating excitement but they won't anymore if this is how you are going to play it. So either do it right or don't do it at all.

---

[2]    Ade controverts this statement, saying that "sales staff was 'pretty much used' to [Ade's] cussing and Lopez never made any complaints to Smith about [Ade's] cussing or any other issues with her," citing to Lopez's deposition. Doc. 41 at 4. But whether staff were used to her swearing does not controvert the statement that Ade swore more than most—it actually underscores it. Further, whether Lopez ever complained does not address the claim that others complained.

> This place was a shit show yesterday, all 12 hours I was here, and now I'm here getting a couple things finished up and it's still a shit show. It's little things like not paying employees right that cost you more in the long run. I will stop now because I could go on all day why it's a cluster f*#% here, but I won't.

Doc. 38 at 12. The "shit show" remark was in reference to an incident where the same car was inadvertently sold to two different customers. *Id.* The "contest" was a monthly sales contest for sales representatives. Doc. 41 at 11. At Conklin Cars, sales representatives receive a guaranteed monthly salary of $3,000, but they can earn more than the guaranteed monthly salary with commissions and bonuses. Doc. 38 at 10-11. However, employees are expected to sell enough to cover the monthly guaranteed salary. *Id.* Only the amount of commissions and bonuses earned over the $3,000 guarantee is paid out as extra income. *Id.* This was true for all contest payouts as well. Doc. 46 at 21-22.[3] Ade understood how the bonus structure at Conklin Cars worked. Doc. 38 at 11.

Smith responded to Ade's email, saying, "I will tal[k] with you when [I] get back. If you are that unhappy maybe this is not for you[.]" *Id.* at 12. Ade replied, "Maybe. Its hard to work with lazy people." *Id.* After she sent the email, Ade posted "who is hiring" on Facebook. *Id.* Some current and former Conklin Cars employees saw the post and made comments. *Id.* Lopez saw the post and believed it to mean Ade was planning to resign. *Id.* Ade maintains she was not looking for a new job. Doc. 41 at 5. Although Smith did not see the Facebook post himself, others asked him about it. Doc. 38 at 13. Until the time Ade posted on Facebook about whether anyone was

---

[3] Ade attempts to controvert this statement by stating that the sales contest referenced in her email "was unique to the traditional bonus program because Smith did not recall the precise bonus terms of the contest." Doc. 41 at 11. The testimony cited—from Smith's deposition—only states that he cannot remember the exact terms of the contest, but it "was probably based on sales." But he also stated that any payout from the contest would still count against the guaranteed salary because "[e]verything goes to the guarantee before you pay it." Doc. 41-3 at 16 (deposition page 59, lines 1-9). As discussed further below, this does not establish that the terms of the sales contest referenced in the email were somehow unique to the typical bonus structure at Conklin Cars.

hiring, Smith testified that he had intended to discuss Ade's complaints and work towards a resolution so she could stay employed at Conklin Cars. *Id.* But after the Facebook post, Smith testified he had had enough of Ade's disruptive behavior and decided to terminate her. *Id.*

When Smith returned to work on June 12, 2017, he had a sales manager meeting at which both Ade and Lopez were present. *Id.* at 13. After the meeting, Ade left to retrieve her phone. Doc. 38 at 13; Doc. 41 at 6. When Ade returned, Smith, along with another manager, Scott Johnson, told Ade her employment was terminated. Doc. 38 at 14. When Ade asked for more information, Smith stated he was not able to give her a reason. *Id.* Ultimately, the stated grounds for Ade's termination were "Disruptive Behavior," "Conflict/Refusal to work with Co-Worker," and "Insubordination." *Id.* at 13.[4] Before she was fired, Ade had not received any formal disciplinary write-ups; any disciplinary action had been verbal only. Doc. 41 at 10.

### C.    Post-Termination

After Ade was fired, she talked with Lopez and said she suspected another employee had orchestrated her termination. Doc. 38 at 14. Lopez and Ade both agreed they had made a good team. *Id.*; Doc. 41 at 6.

Although Lopez had never complained about Ade before her termination, and Lopez and Ade had a friendly relationship outside of work, Doc. 38 at 15; Doc. 41 at 11, Ade later began to suspect that Lopez had influenced Smith's decision to fire her because Lopez was jealous of Ade's sales record and generally disliked women. Doc. 38 at 14.

Regarding the sales record, Conklin Cars typically tracked both the total number of vehicles sold and the total profits from the sales. *Id.* at 16. During the time Ade was Used Car

---

[4]    Ade controverts this statement on the grounds that the reasons given for her termination were pretext. But his does not meet the substance of the factual allegation, *see* D. Kan. Rule 56.1(e), and is simply a legal argument.

Sales Manager, she sold more vehicles than Lopez, but Lopez's total sales revenue during that time was higher, as was his revenue per vehicle sold. *Id.* at 16; Doc. 41 at 11-12. But just for the month of May 2017, Ade's volume and revenue numbers were higher than Lopez's. Doc. 41 at 11-12.

Regarding why she thinks Lopez dislikes women, Ade said that he once asked an overweight woman why she was wearing a "muumuu." Doc. 38 at 15; Doc. 38-2 at 16 (deposition pages 115-116). Ade also said that, when she returned to work at the Salina location, Lopez told her that another female employee, Sue Seybert, hated him. This apparently stemmed from a consensual sexual encounter Lopez had with another Conklin Cars employee, who Seybert had then counseled to report Lopez for sexual harassment. Doc. 38-2 at 16 (deposition pages 115-116); Doc. 38 at 15. In addition to the incident involving Seybert, another employee accused Lopez of sexual harassment because he had received nude photos from her. Doc. 38 at 15. Lopez was "written up" for these incidents and received sexual harassment training. No other employees have made allegations against him since. *Id.*; Doc. 41 at 9.

Ade also believes Lopez met with Smith on the day she was fired. Doc. 41 at 6. Ade bases this on a text she received from another Conklin Cars employee, Braydon Jeffrey, who reported that Lopez and Smith met while Ade was retrieving her phone. *Id.* Conklin Cars contends that the only meeting between Lopez and Smith was the June 12 sales meeting that Ade also attended, and that there were no other meetings that day between Lopez and Smith. Doc. 38 at 14 (citing to deposition testimony by Smith and Lopez that they never discussed Ade's performance before her termination).

After Ade was fired, Lopez transitioned from Used Truck Manager to Used Cars Sales Manager, Ade's vacated position. *Id.*; Doc. 41 at 11. This occurred because the G.M. Manager at

Conklin Cars felt more comfortable taking over the Used Truck Manager job (Lopez's position), because it was similar to his current job. *Id*. at 15. Lopez did not ask to become the Used Cars Sales Manager but was willing to take the job. *Id*. Lopez's pay did not increase because of the switch. *Id*.

## II.     STANDARD

Summary judgment is appropriate if there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of establishing the absence of a genuine issue of fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the nonmovant to demonstrate that genuine issues remain for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). To carry this burden, the nonmovant "may not rely merely on . . . its own pleadings." *Nahno-Lopez v. Houser*, 625 F.3d 1279, 1283 (10th Cir. 2010) (internal quotations and citations omitted). "Rather, it must come forward with facts supported by competent evidence." *Id*. The inquiry turns on "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). In applying this standard, courts must view the evidence and all reasonable inferences from it in the light most favorable to the nonmovant. *Matsushita*, 475 U.S. at 587.

## III.     ANALYSIS

Ade asserts two claims stemming from her termination. The first is a Title VII discrimination claim. The second is a state-law retaliatory-discharge claim. For the reasons discussed below, the Court finds that Conklin Cars is entitled to summary judgment on both claims.

**A.** **Ade's Title VII claim fails because she has not demonstrated that the stated reasons for her termination were pretext for discrimination.**

Ade alleges she was fired because of her sex in violation of Title VII. Doc. 36 at 5. Where a plaintiff only has indirect or circumstantial evidence of discrimination, the *McDonnell-Douglas* burden-shifting framework applies. *Thomas v. Berry Plastics Corp*., 803 F.3d 510, 514 (10th Cir. 2015). Ade agrees this is the standard that applies in this case. Doc. 41 at 16. Under this framework, Ade must first demonstrate a prima facie case of discrimination by establishing (1) she was a member of a protected class; (2) she suffered an adverse employment action; and (3) that the circumstances give rise to an inference of discrimination. *E.E.O.C. v. PVNF, L.L.C.*, 487 F.3d 790, 800 (10th Cir. 2007).

Once Ade establishes a prima facie case of discrimination, the burden shifts to Conklin Cars to articulate a legitimate, nondiscriminatory reason for her termination. *Id.* If Conklin Cars can do so, the burden shifts back to Ade to demonstrate the existence of a genuine issue of material fact that the proffered reasons are pretext. *Id.*

Here, Conklin Cars concedes in its reply that Ade "is capable of establishing a *prima facie* case of discrimination under the [*McDonnell-Douglas* framework]." Doc. 46 at 23. Accordingly, the Court does not reach that issue. Further, the Court finds that Conklin Cars has articulated a legitimate and nondiscriminatory reason for firing Ade.[5] Specifically, Conklin Cars states that it fired Ade for "Disruptive Behavior," "Conflict/Refusal to work with Co-Worker," and "Insubordination." Doc. 38 at 13. This was allegedly because of the incidents discussed above, and because of Ade's Facebook post.

---

[5]   Ade's response acknowledges that her swearing, her complaints about the workplace, and her Facebook post were the stated nondiscriminatory reasons for her termination. Although Ade argues these are pretextual, she does not dispute that Conklin Cars has met its burden under the *McDonnell-Douglas* framework. Doc. 41 at 21.

Accordingly, the burden now shifts back to Ade to demonstrate that the stated reasons for her termination were pretext.

> ### 1. Ade has not pointed to evidence suggesting that the stated reason for her termination is unworthy of belief.

Ade argues that the stated reasons for her termination were pretext to cover up for sex discrimination. A plaintiff may demonstrate pretext by pointing to facts that a factfinder could rely on to conclude that the stated reason for her termination is unworthy of belief. *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1230 (10th Cir. 2000). This can be done by pointing to evidence of "such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions" in the stated reason. *PVNF*, 487 F.3d at 801. Ade raises several issues that she says demonstrate these reasons—her disruptive behavior and Facebook post—are not worthy of belief.

First, she argues that swearing was common at Conklin Cars, and she was not aware of anyone being disciplined or fired because of it. Doc. 41 at 21-22. But it is uncontroverted that Ade swore more than most. It is also undisputed that Smith had to speak with her about it on at least three occasions in the few months she was back working at the Salina location. Doc. 38 at 7, 10. Nor does Ade's lack of knowledge about whether any employees were disciplined for swearing demonstrate that the stated reasons for her termination were pretext. It is, at most, speculation.

Second, Ade argues that the disputes she had with coworkers can be viewed in "a better light" when considering her side of the story. Doc. 41 at 22. Specifically, regarding the car wash incident, Ade testified at her deposition that she recalled it to be an ongoing problem, not a one-off incident, though she does not dispute she tried to fire the employee in question even though he was not under her authority. Doc. 41 at 4. With regard to her complaints about the finance department, Ade clarifies that her comments that it was "too slow" and "slow as fuck" referred to the finance <u>department</u>, not the finance manager personally. *Id.* And finally, although she does not

dispute that she told a sales representative that he was a "cry baby" and that she could do "whatever the fuck" she wanted with regard to sales referrals, Ade clarifies that she also explained the criteria she used in deciding to whom to refer sales. *Id.* Frankly, none of these clarifications frame these incidents in a better light. And they certainly do not call into question or somehow cast doubt on Smith's conclusion that Ade was disruptive at work.

Third, Ade claims that she was never written up before her termination, suggesting that the stated reason for her termination—disruptive behavior—is an implausible justification. Doc. 41 at 22-23. Although there is no evidence that Ade was written up, it is undisputed that Ade's managers raised concerns about her behavior with her several times. Doc. 38 at 10.

Fourth, Ade claims that she was treated differently than male coworkers, in particular Lopez, whose conduct she alleges was much more egregious than her behavior. Doc. 41 at 17-23.[6] A plaintiff may also show pretext by demonstrating that she "was treated differently from other similarly situated, nonprotected employees who violated work rules of comparable seriousness, provided the similarly situated employee shares the same supervisor, is subject to the same performance standards, and otherwise faces comparable relevant employment circumstances." *BCI Coca-Cola*, 450 F.3d at 489 (quoting *Green v. New Mexico*, 420 F.3d 1189, 1194 (10th Cir. 2005) (internal quotations omitted)). "Individuals are considered 'similarly-situated' when they deal with the same supervisor, are subjected to the same standards governing performance evaluation and discipline, and have engaged in conduct of 'comparable seriousness.'" *PVNF*, 487 F.3d at 801. But not every difference in treatment points to discriminatory intent; differences

_____

[6]   Much of Ade's discussions of disparate treatment between her and her male coworkers is in the context of establishing her prima face case. Doc. 41 at 17-20. But she refers to this alleged disparity in her pretext analysis as well. *Id.* at 20-23. Although Conklin Cars has conceded that Ade can establish a prima facie case, pretext can be shown through disparate treatment of similarly situated coworkers. *E.E.O.C. v. BCI Coca-Cola Bottling Co. of Los Angeles*, 450 F.3d 476, 489 (10th Cir. 2006). Accordingly, the Court addresses Ade's claims about other co-workers in the context of the pretext analysis.

explained by nondiscriminatory motives do not establish pretext. *Kendrick*, 220 F.3d at 1231. In a pretext analysis, courts look at the facts as they appear to the person making the decision. *Id*.

Given these standards, the Court finds Ade has not demonstrated pretext through differences in treatment between her and Lopez. Although she says that Lopez used "vulgar statements" and swore at work, she only recalled one or two comments, and there are no facts alleging that management was ever even made aware of them.[7] By contrast, it is undisputed that Ade swore to a degree that made her stand out, and Smith had to talk to her about it several times. Further, her termination was not based solely on one or two isolated incidents of swearing.

Nor has Ade demonstrated pretext based on the fact that Lopez was not fired after two allegations of sexual harassment. As explained above, a claim of pretext based on different treatment requires a showing that the employees and conduct being compared are similar. *BCI Coca-Cola*, 450 F.3d at 489. But Ade has provided almost no facts to suggest that her and Lopez's situations were sufficiently similar to draw an inference of pretext. The details are scant regarding the incidents, including any mitigating or aggravating circumstances, precisely what punishment (other than the fact that Lopez was "written up") resulted, and the nature of any "settlement" that resulted. There are no facts stating when the incidents took place, which makes it difficult to draw comparisons. "Employers' disciplinary practices necessarily change over time, and it would be inappropriate for courts to penalize employers who have modified their practices over a substantial period of time in an effort to better address their business needs." *Kendrick*, 220 F.3d at 1234. Nor are there any facts regarding who was in charge of Lopez at the time of the conduct, what title Lopez held, and who meted out the punishment. *See BCI Coca-Cola*, 450 F.3d at 489 (allowing

---

[7] Ade also discusses an incident where she witnessed two managers, both men, get into an altercation with a sales representative in front of a customer. Doc. 41 at 8-9. But by Ade's own admission, she has no knowledge about whether Smith took any action against the managers one way or the other. *Id*. at 19.

comparisons for pretext purposes where a similarly situated employee has the same supervisor and employment circumstances and is subject to the same performance standards).

Fifth, Ade calls into question Smith's stated reason for termination—the Facebook post—because Smith did not read the post or discuss it with Ade before firing her. Doc. 41 at 23. But importantly, there is no contention that Smith was not aware of the Facebook post—only that he did not see it personally. It is uncontroverted that other employees at Conklin Cars brought the post to Smith's attention. Doc. 38 at 13. Equally unavailing is Ade's argument that Smith should have at least discussed it with her before making the termination decision. She claims that not giving her a second chance or allowing her to explain why she made the post demonstrates that the Facebook post was not the real reason for her termination. Doc. 41 at 23. That is nonsensical. Beyond that, "[a] company must be allowed to exercise its judgment in determining how severely it will discipline an employee for different types of conduct." *Kendrick*, 220 F.3d at 1233. Further, it is undisputed that it was Ade's disruptive behavior as well as—and including—the Facebook post that led to Smith firing her. Doc. 38 at 13.[8] Ade's belief that Smith should have given her another chance or somehow reacted differently does not cast doubt on the stated reason for her termination. *See Kendrick*, 220 F.3d at 1233 ("Different supervisors will inevitably react differently to employee insubordination.").

Accordingly, for these reasons, the Court finds that Ade has not presented any evidence from which a reasonable factfinder could find the stated reasons for her termination unworthy of belief.[9]

---

[8] The Court notes that Ade controverts the stated reasons for her termination, but only on the grounds that they were pretext. Doc. 41 at 6. But as discussed throughout, Ade has not pointed to any factual grounds that would render the stated reasons for her termination unworthy of belief.

[9] Ade includes in her brief some arguments that Conklin Cars "favored" men over women because there were more men working at the Salina location than women. Doc. 41 at 19. But this argument is not included as a basis for

    **2.**    **Ade's "cat's-paw" theory does not demonstrate pretext because she has no evidence that any action or animus of Lopez caused or contributed to Smith's decision to fire her.**

Although Ade's response brief does not specifically identify the "cat's-paw" theory, she does argue that Lopez's animus toward women may have contributed to her firing. Doc. 41 at 20. But named or not, that argument encompasses the theory.

The cat's paw theory of liability in employment-discrimination cases refers to situations where a biased subordinate who does not have the power to make an employment decision uses the actual decisionmaker "as a dupe in a deliberate scheme to trigger a discriminatory employment action." *BCI Coca-Cola*, 450 F.3d at 484. In other words, the cat's-paw theory is a manner of demonstrating pretext—that the stated reason was not the real reason, but that the employment action was the result of the actions of a biased subordinate. The Tenth Circuit has endorsed this as a valid theory of liability because "[h]olding employers accountable for the actions of biased subordinates also advances the purposes of Title VII." *Id*. at 487. A plaintiff may rely on the cat's-paw theory where she lacks evidence that the actual decisionmaker had an unlawful discriminatory animus. *Thomas*, 803 F.3d at 514-15.

The Tenth Circuit has clarified that "a plaintiff must establish more than mere 'influence' or 'input' in the decisionmaking process" by the biased subordinate. *BCI Coca-Cola*, 450 F.3d at 487. "Rather, the issue is whether the biased subordinate's discriminatory reports, recommendation, or other actions <u>caused</u> the adverse employment action." *Id*. (emphasis added) To survive summary judgment on this theory, there must be a genuine issue of material fact as to the discriminatory bias of the subordinate. *Id*. at 488. The plaintiff must then "demonstrate a causal

---

pretext. Nor does the fact that a car dealership employs more men than women alone somehow demonstrate that the stated reasons for Ade's termination were unworthy of belief.

relationship between the subordinate's actions and the employment decision." *Id.*; *see also Thomas*, 803 F.3d at 515 (requiring showing of a (1) retaliatory animus of subordinate, and (2) that the subordinate's animus caused the decisionmaker to take the adverse action).

Here, Ade alleges that Lopez—the alleged biased subordinate—harbored an animus against women, and that he caused Smith to fire her. But she offers little evidence to support that claim. The only evidence of Lopez's discriminatory animus is that he once made an insulting remark about an overweight woman, and that he was twice accused of sexual harassment—once involving a consensual relationship, and the other involving Lopez receiving nude photos from a co-worker. The Court is highly skeptical that these scant facts create a genuine issue of material fact that Lopez harbored a bias against women.[10]

But more problematic for Ade is that she has no evidence tying Lopez to her termination. Ade alleges that another employee, Braydon Jeffrey, told or texted her that Lopez and Smith met on the morning she was fired. Doc. 41 at 6. But that is hearsay and is not admissible evidence. *See* Fed. R. Civ. P. 56(b)(2); *see also* Fed. R. Evid. 801(c); Fed. R. Evid. 802. Ade states in her response that this is not hearsay "because it is not being offered to prove the truth of the matter asserted, which is that Lopez's animus towards women contributed to [Ade's] firing. Rather, [it] is merely being offered to show that a conversation took place between Lopez and Smith in [Ade's] absence." Doc. 41 at 20. But Ade misapplies the hearsay definition. Although Ade attempts to rely on Jeffrey's statement to meet the required element of causation, she is offering it precisely to prove what it says: that Lopez met with Smith on the morning of her termination. This is classic

---

[10] To the extent Ade alleges that Lopez orchestrated her termination because he was jealous of her sales record and wanted her job, the facts do not support this claim. *See* Doc. 38 at 16; Doc. 41 at 11-12 (showing that Lopez and Ade's sales records were equivocal at best); Doc. 38 at 15 (uncontroverted that Lopez did not seek out Ade's vacated position but only took it after another employee turned it down). Even if the facts did support Ade's position, this does not establish Lopez had any discriminatory animus toward women.

hearsay, and it is not sufficient to create a genuine issue of material fact to avoid summary judgment. *See Rice v. Wal-Mart Stores, Inc.*, 12 F. Supp. 2d 1207, 1212 (D. Kan. 1998). Even if the Court did accept the fact that Lopez and Smith met, that fact would not be sufficient to create a triable issue of fact on causation. Ade has no evidence that they discussed her, let alone any evidence that Lopez influenced or caused Smith to fire her. By contrast, the uncontroverted facts show that Smith decided to fire Ade after hearing about her Facebook post before he returned from vacation, and that Smith and Lopez never discussed Ade. This severs any causal connection between Lopez and Ade's termination.

Accordingly, Ade's cat's-paw theory—that Lopez harbored a bias and orchestrated her termination—fails.

**B.     Conklin Cars is entitled to summary judgment on Ade's retaliatory-discharge claim.**

In addition to her Title VII claim, Ade claims she was fired in violation of Kansas public policy. Kansas is historically an at-will employment state, meaning that employers can typically fire employees at any time and for any reason. *Campbell v. Husky Hogs, L.L.C.*, 255 P.3d 1, 3-4 (Kan. 2011). But there are exceptions. Kansas allows the "common-law tort of retaliatory discharge . . . when it is necessary to protect a strongly held state public policy from being undermined." *Id.* at 5. Although there are several recognized public-policy interests that may support a claim of retaliatory discharge in Kansas, two are relevant here. Specifically, Ade claims she was fired in retaliation for exercising rights under the Kansas Wage Payment Act ("KWPA") and for whistleblowing. Both are recognized public-policy interest that can support a retaliatory-discharge claim. *Id.* at 4, 7.

The parties do not dispute that Ade was an at-will employee of Conklin Cars. So, to sustain a claim for tortious retaliation, she must demonstrate that that Conklin Cars fired her because she

exercised her right under the KWPA, or because she was a whistleblower. The parties also agree that Ade's claim of retaliatory-discharge is based on this one statement made by Ade in an email to Smith:

> There is no reason the contest payouts should [be] taken out of the salesperson guarantee. If it's a bonus it's a bonus. They should be paid the 1500 plus the bonus they won. You do this to get them excited to sell and then turn around and not pay. That is just wrong.

Doc. 38 at 12, 28; Doc. 41 at 26. Each theory—a KWPA complaint and whistleblowing—is discussed in turn.

### 1.     Ade's email was not a clear statement that she was invoking the KWPA.

The KWPA requires employers to promptly pay wages and benefits and creates a system of redress for "Kansas workers to secure unpaid wages earned from their labors." *Campbell*, 255 P.3d. at 6-7 (explaining provisions of the KWPA). To exercise rights under the KWPA for purposes of a retaliatory-discharge claim, a worker must either file an actual KWPA claim or otherwise raise an internal complaint that "is clear enough that the employer would understand that the employee is asserting rights protected by the [KWPA]." *Deeds v. Waddell & Reed Inv. Mgmt. Co.*, 280 P.3d 786, 792 (Kan. Ct. App. 2012).

In *Deeds*, the plaintiff complained at least five times about the phasing out of a particular trailer commission structure. *Id.* at 790-91. He complained that the change was a breach of the employment contract but never mentioned the KWPA. *Id.* When asked what relief he wanted, he replied, "A fair compensation plan or return of those trailer commissions." *Id.* The Kansas Court of Appeals held that those statements were only "equivocal with regard to a potential claim under the [KWPA]," which was not sufficient to suggest a claim for wages due under the KWPA. *Id.* at 792. The court went on to clarify that, "[w]ithout some clear indication" that a worker is invoking

the KWPA, "there can be no claim against the employer for retaliation in response to the employee's exercise of his rights under that statute." *Id.* at 793.

*Deeds* is analogous to this case. There is no allegation here that Ade ever filed an actual KWPA claim. Further, her email to Smith fairly plainly asserts that she just disagreed with the terms of the contest; it does not make any claim for specific wages due. *See id.* (explaining that, "while [Deeds] complained about the change in the <u>terms of compensation</u>, he said that he could be satisfied either with return of the prior terms or some 'fair compensation plan,'" and noting that this "latter option does not suggest a claim under the [KWPA]" (emphasis added)). Like in *Deeds*, Ade's statement is at best equivocal with regard to whether it is asserting rights under the KWPA. Accordingly, no reasonable factfinder could conclude that that Ade gave a "clear indication" that she was pursuing rights under the KWPA. Without that, she cannot sustain a claim for retaliatory termination.[11]

### 2. Ade has no factual support for a retaliatory-discharge claim based on whistleblowing.

To assert a claim for retaliatory discharge based on whistleblowing, "an employee has the burden of proving by clear and convincing evidence, under the facts of the case, a reasonably prudent person would have concluded the employee's co-worker or employer was engaged in

---

[11] Conklin Cars also argues that Ade cannot sustain a claim for retaliatory discharge because she was not complaining about a KWPA violation as to herself, but instead was asserting the rights of others. Doc. 38 at 28. Ade responds that Kansas courts have extended retaliatory-discharge protections to those asserting rights on behalf of spouses or close family members, and she argues that this should extend to co-workers as well. Doc. 41 at 24-25. But neither side has come forward with definitive authority supporting their position, nor has either side presented any authority directly on point. Ade cites *Marinhagen v. Boster, Inc.*, 840 P.2d 534 (Kan. Ct. App. 1992), and *Thummel v. PSI Transport, LLC*, 2015 WL 475183 (D. Kan. Feb. 5, 2015), in support of her position. Doc. 41 at 27. In those case, the plaintiff was fired after a <u>relative</u> (who also worked for the employer) took the protected action. That is distinct from this case, where Ade claims she was fired because <u>she</u> complained. Likewise, the cases cited by Conklin Cars do not conclusively require that the KWPA complaints focus on the terminated employee's own wages—that just happened to be the factual scenario in the cases cited. Doc. 38 at 28. Nevertheless, given that Ade's email could not be construed as asserting anyone's rights under the KWPA, the Court need not reach this question.

activities in violation of rules, regulations, or the law pertaining to public health, safety, and the general welfare." *Palmer v. Brown*, 752 P.2d 685, 690 (Kan. 1988). The employer must know of the employee's reporting before termination and must have made the termination decision in retaliation for the report. *Id.* "However, the whistle-blowing must have been done out of a good faith concern over the wrongful activity reported rather than from a corrupt motive such as malice, spite, jealousy or personal gain." *Id.*

Ade's whistleblowing claim is also based on the same purported violations of the KWPA. She asserts that her claim should survive because a reasonably prudent person in her position could have concluded that Conklin Cars was violating the KWPA, even if she was ultimately incorrect. Doc. 41 at 29. There are several problems with this theory.

First, the Court disagrees that Ade can circumvent the holding in *Deeds* that a retaliatory-discharge claim based on a KWPA violation requires a complaint that is "clear enough that <u>the employer</u> would understand that the employee is asserting rights protected by the [KWPA]," *Deeds*, 280 P.3d at 792, to a standard that only requires that <u>the employee</u> making the complaint believe there was a violation.[12]

Second, Ade has not explained how the KWPA is a "law pertaining to public health, safety, and the general welfare." *Palmer*, 752 P.2d at 690. If it was, Kansas courts would not have needed to craft a separate public-policy exception allowing terminated employees to challenge their firing based on exercising rights under the KWPA. *See Campbell*, 255 P.3d at 4, 7 (noting that Kansas courts have endorsed retaliatory-discharge claims for at-will employees in instances of

---

[12] The Court acknowledges *Roth v. Francesca's Collection, Inc.*, which did analyze a reported KWPA violation under the whistleblowing standard. 295 F. Supp. 3d 1177, 1183-84 (D. Kan. 2018). But *Roth* did not include any analysis under *Deeds* that concluded, as the Court has here, that the employer would not have understood that the employee was asserting rights under the KWPA.

whistleblowing, but then also finding a new public-policy exception for those exercising rights under the KWPA).

Third, even if the Court assumed the KWPA did pertain to the public health, safety, or the general welfare, Ade has not asserted any factual support for the contention that a reasonably prudent person in her position would have concluded Conklin Cars was violating the KWPA. Ade asserts that the sales contest referenced in her email was "unique" from the typical bonus structure at Conklin Cars, which required employees to cover the guaranteed $3,000 monthly salary before receiving extra payments. Doc. 41 at 11. She also states that she believed that "the terms of this special contest required Conklin Cars to pay the bonuses on top of their guarantees and that Conklin Cars failed to properly compensate its salespersons under this special bonus program." *Id*. But neither of these assertions is supported by the facts.

Ade's assertion that the sales contest referenced in her email was "apparently unlike the ordinary bonus structure" at Conklin Cars is based solely on the fact that "Smith did not recall the precise bonus terms of the contest." *Id*. at 11, 30 (citing to Smith's deposition testimony). But this is not a reasonable inference to which Ade is entitled. *See Matsushita*, 475 U.S. at 587. Smith was not asked about the "precise bonus terms of the contest." He was only asked what contest Ade was referring to, answering, "I don't remember exactly what the contest was. It was probably based on sales." Doc. 41-3 at 16 (deposition page 59, lines 3-4); Doc. 38-5 at 10 (including deposition page 58, which contains the question asked). This does not establish that the terms of the contest were somehow unique.

Indeed, in the very next question, Smith was asked whether the contest payout would count against the guarantee. He responded, "Everything goes to the guarantee before you pay it." Doc. 41-3 at 16 (deposition page 59, lines 5-9). Accordingly, there is no factual support to base the

inference that the contest was unique or unlike the normal bonus structure—the evidence is actually directly to the contrary.

Ade also asserts in her statement of facts that <u>she believed</u> the "terms of this special contest required Conklin Cars to pay the bonuses on top of their guarantees and that Conklin Cars failed to properly compensate its salespersons under this special bonus program." Doc. 41 at 11. Since the standard is whether a "reasonably prudent person" would believe there was a violation, *Palmer*, 752 P.2d at 690, Ade's subjective belief is irrelevant. The Court also notes that the only factual support Ade cites to in support of this asserted belief is a line from her deposition where Ade stated, "There was bonuses for a context and they were not paid to the salespeople on top of their guarantee." Doc. 41-1 at 2 (deposition page 14, lines 1-3). The question that elicited that answer has not been included, so the Court is unable to discern precisely what question Ade was answering. But taking the answer at face value, it does not support the conclusion that Ade believed the contest referred to in her email was somehow unique from the normal bonus structure. The same is true for her email. These are merely descriptions of how the bonus structure worked. Given this, Ade has not pointed to any evidence a factfinder could rely on to conclude that a reasonably prudent person would have thought that Conklin Cars was somehow violating the KWPA.

Fourth, Ade's email to Smith was not sufficient to invoke whistleblower protection. Complaints of unlawful activity must be reported to company management or law enforcement. *Fowler v. Criticare Home Health Servs., Inc.*, 10 P.3d 8, 14-15 (Kan. Ct. App. 2000). Here, like in *Fowler*, Ade only made the complaint about the contest payouts to Smith, her manager. But to the extent she believed the unlawful conduct came from Smith, she was obligated to "seek out the intervention of a higher authority, either inside or outside of the company." *See id.* at 14-15; *see also Lykins v. CertainTeed Corp.*, 555 F. App'x 791, 795 (10th Cir. 2014) ("Simply reporting to a

higher-level wrongdoer is insufficient.").[13] Under these undisputed facts, Ade's conduct does not amount to whistleblowing. As *Fowler* explained, not "every workplace dispute over the water cooler on company practices" rises to the level of whistleblowing. *Fowler*, 10 P.3d. at 15; *see also Lykins*, 555 F. App'x at 795 ("Obviously, something more is required to differentiate internal dissatisfaction from the protected act of whistleblowing.").

Accordingly, Conklin Cars is entitled to summary judgment on Ade's retaliatory-discharge claim based on whistleblowing.

## IV.     CONCLUSION

THE COURT THEREFORE ORDERS that the motion for summary judgment (Doc. 37) is granted. Judgment is to be entered for Defendant Conklin Cars.

THE COURT FURTHER ORDERS that the status conference set for June 27, 2019, at 1:00 p.m. is canceled.

IT IS SO ORDERED.

Dated: June 20, 2019                    */s/ Holly L. Teeter*_____
                                        HOLLY L. TEETER
                                        UNITED STATES DISTRICT JUDGE

---

[13]  In *Lykins*, the Tenth Circuit also rejected that plaintiff's reliance on *Connelly v. State Highway Patrol*, 26 P.3d 1246 (Kan. 2001)—a case Ade also relies on to conclude that she did not need to report outside her chain of command. Doc. 41 at 29. The Tenth Circuit noted that, in *Connelly*, the reports by a state trooper were made in the chain of command, but who also happened to be other "law enforcement officials." *Lykins*, 555 F. App'x at 795. There are no such allegations in Ade's case.